**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| MICHELLE LEANN PILCHER, | CASE NO. 3:22-cv-02167 |
| Plaintiff, | DISTRICT JUDGE JAMES G. CARR |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Michelle Leann Pilcher ("Plaintiff" or "Ms. Pilcher") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2. For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.     Procedural History

Ms. Pilcher protectively filed her DIB application on November 2, 2020, alleging a disability onset date of March 18, 2019. (Tr. 12, 74, 186-89, 200.) She alleged disability due to left shoulder injury, right wrist injury, repeated kidney stones, and anxiety. (Tr. 95, 106, 203.) Her application was denied at the initial level (Tr. 91-100) and upon reconsideration (Tr. 102-11). She then requested a hearing. (Tr. 114-15.) On November 12, 2021, a telephonic hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 36-64.) The ALJ issued an unfavorable decision on December 21, 2021, finding Ms. Pilcher had not been under a disability

from March 18, 2019, through the date of the decision.  (Tr. 10-31.)  The ALJ explained that Ms. Pilcher had filed an earlier Title II application that was denied on February 10, 2020, with no further appeal, and he found no reason to reopen the prior application.  (Tr. 12.)  Therefore, he concluded that he would "only consider the period from February 11, 2020 through the date of [his] decision," although Ms. Pilcher had alleged disability as of March 18, 2019.  (Tr. 12-13.) Those findings and conclusions are not challenged in the pending appeal.  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 183-85.)  The Appeals Council denied her request for review on October 5, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Plaintiff filed the pending appeal on December 2, 2022 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 8 & 10).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Pilcher was born in 1981 and was thirty-eight years old on her alleged disability onset date.  (Tr. 26.)  She has a college education.  (Tr. 41, 204.)  At the time of the hearing, she lived with a roommate and her adult son and daughter.  (Tr. 40.)  She has past work as a nurse assistant.  (Tr. 26, 41-42, 51.)  She also worked in a factory collecting lab samples and performed manual labor unloading pallets of food products.  (*Id*.)

### B.     Medical Evidence

#### 1.     Treatment History

##### i.     Physical Impairments

Ms. Pilcher injured her left shoulder while moving a patient at work in 2015.  (Tr. 254, 555.)  She had three surgeries on her left shoulder, two in 2016 and an arthroscopy-capsular release on August 5, 2019, which was performed by Darin Nye, M.D., at the Northwest Ohio

2

Orthopedic Surgery Center.  (Tr. 254, 328-31.)  Ms. Pilcher complained of pain and stiffness in her left shoulder during follow up appointments with primary care physician Stephen Freshwater, M.D., in September and December 2019.  (Tr. 347, 360.)  At her December 2 appointment, she expressed frustration over not yet receiving workers compensation approval for therapy.  (Tr. 360.)  She also reported that she was routinely taking Percocet because her pain was bad and she was stiffer due to not being in therapy.  (*Id*.)

Left shoulder x-rays from January 21, 2020, showed no focal osseous abnormality.  (Tr. 363.)  At a follow up with Dr. Freshwater on February 25, 2020, Ms. Pilcher reported attending six physical therapy sessions since she saw him at the end of 2019, but said no other sessions were approved.  (Tr. 383.)  She was trying to perform stretching on her own, but was limited.  (*Id*.)  Her pain level was the same and she was taking three Percocet during the day and a fourth at night.  (*Id*.)  Her gait was normal on examination, but she did not swing her left arm when walking.  (*Id*.)  She had left shoulder tenderness, and could bring her arm forward to about 90 degrees with her palm up and abduct to about 60 degrees.  (*Id*.)  She could move her arm back far enough to get the palm of her hand on the right buttock, but could not get her fingers moved over to the midline.  (*Id*.)  Strength in her bicep and triceps on the left was 4/5.  (*Id*.)  Hand grasps were 4+/5 and she had trouble holding her fingers separated against resistance.  (*Id*.)  Dr. Freshwater extended Ms. Pilcher's time off work through June and advised her to try to decrease her use of Percocet.  (Tr. 384.)

Ms. Pilcher continued to report pain and stiffness during a follow-up appointment with Dr. Freshwater on May 18, 2020, but said a chiropractor was working on the pain and stiffness in her left posterior neck.  (Tr. 402.)  She was taking care of her father, who had multiple medical problems.  (*Id*.)  On examination, she still did not swing her left arm when walking.  (Tr. 403.)

She had no tenderness over her cervical spine but did have tenderness around her left scapula and moderate muscle tenderness in her upper trapezius. (*Id*.) She could raise her left arm forward to about 90 degrees, but it appeared painful to move above 45 degrees. (*Id*.) She could not get her left hand behind her back. (*Id*.) Her bicep strength was 4+/5 and her triceps strength was 4-/5. (*Id*.) She had normal grasp strength and sensation in her left arm was subjectively intact. (*Id*.)

Ms. Pilcher returned to Dr. Freshwater on October 1, 2020, complaining of "having a horrible time with her [left] arm into the shoulder" for about two to four weeks. (Tr. 456.) She did not know what caused the flare up in her pain. (*Id*.) On examination, she still did not swing her left arm when walking. (*Id*.) She had tenderness in the left scapula, left rhomboids, posterior cervical muscles, and cervical and thoracic spine. (*Id*.) Dr. Freshwater was not able to move her left shoulder more than 30 degrees in any direction due to pain. (*Id*.) He prescribed topical Lidocaine and Prednisone for muscle pain and swelling, and continued Percocet. (Tr. 457.)

Ms. Pilcher also had follow-up appointments with orthopedic surgeon Dr. Nye in 2020. (Tr. 539-62.) When Ms. Pilcher returned to Dr. Nye on October 26, 2020, she reported that workers compensation had approved twelve physical therapy visits and twelve chiropractic visits. (Tr. 531.) Dr. Nye reminded her that her shoulder would "likely never be normal." (*Id*.) He indicated Ms. Pilcher had come to grips with that fact, reporting she was "grateful that her shoulder [was] better now than it was when she first presented" to him. (*Id*.) She also reported that surgery had helped "her function and range of motion." (*Id*.) Dr. Nye noted: "Objectively, she certainly demonstrate[d] improvement in range of motion and function compared to preop." (*Id*.) In addition to physical therapy and chiropractic care, Dr. Nye recommended the following as needed for pain: ice or heat, NSAIDS or Tylenol, and topical analgesics. (*Id*.)

In October and November 2020, Ms. Pilcher participated in physical therapy (Tr. 480-82, 489-94, 498-99, 503-06, 510-11, 517-18, 522-23, 532-38) and received chiropractic care (Tr. 495-97, 500-02, 507-09, 512-15, 519-21, 524-27).

When Ms. Pilcher returned to Dr. Freshwater on November 6, 2020, she reported she had started physical therapy and was in a lot of pain.  (Tr. 466.) She also reported settling her workers compensation claim after they "wore her down after every single request."  (*Id*.)  Her settlement included twelve therapy sessions.  (*Id*.)  She said she had attended four therapy sessions, but had not gone that day because she was in too much pain.  (*Id*.)  She reported using Percocet, topical Lidocaine, and Flexeril for pain management.  (*Id*.)  Dr. Freshwater commented that Ms. Pilcher appeared sad during the appointment, but she denied feeling depressed; she said she was frustrated with the workers compensation process and how long the claim had been disputed.  (*Id*.)  They decided to try Cymbalta for muscle and nerve pain.  (Tr. 466-67.)

At a chiropractic appointment on November 18, 2020, Ms. Pilcher appeared in "good spirits."  (Tr. 495.)  She reported continued improvement, noting less severe pain, improved mobility, and greater ability to perform activities of daily living.  (*Id*.)  Ms. Pilcher was discharged from physical therapy on November 27, 2020, because she had no additional visits available through workers compensation.  (Tr. 481.)  Her discharge summary reflected that she demonstrated decreased pain and increased range of motion since starting therapy, with 20% reported subjective improvement.  (*Id*.)

Ms. Pilcher attended a follow-up orthopedic visit with Brady Decker, PRN, on December 7, 2020.  (Tr. 483-86.)  Ms. Pilcher reported that physical therapy and chiropractic care had improved her pain and spasms of the trapezius.  (Tr. 483.)  She estimated 20% improvement in symptoms, but said she still had constant pain in her shoulder which she rated a 5/10.  (*Id*.)  She

reported waking up with pain and said her pain was worse with increased activity.  (*Id*.)  On examination, Ms. Pilcher had active forward flexion of 135 degrees and passive flexion of 150 degrees, both with minimal pain.  (Tr. 485.)  External rotation with her arm at the side was 50 degrees, and she had "winging of [her] scapula."  (*Id*.)  Her glenohumeral joint was stable.  (*Id*.)  There was mild tenderness in her posterior joint line and mild tenderness to palpation over her trapezius with some spasticity.  (*Id*.)  She had 4+/5 strength in the supraspinatus, 5-/5 strength in with infraspinatus, and 5/5 strength distally.  (*Id*.)  Her sensation to light touch was intact bilaterally.  (*Id*.)  PRN Becker explained that her shoulder would "likely never be normal" and she would "likely have chronic, residual stiffness, pain and dysfunction."  (Tr. 486.)  Ms. Pilcher was encouraged to continue with conservative care, including physical therapy and chiropractic care through Medicaid since she was out of workers compensation approved therapy visits.  (*Id*.)  Ms. Pilcher declined a follow-up orthopedic appointment.  (*Id*.)

Ms. Pilcher presented for a primary care appointment with Erica Yarbrough, PA-C, on January 6, 2021, complaining of general aches, feeling run down, abdominal pain, and nausea. (Tr. 803.)  Examination findings included normal gait, normal strength in all extremities, intact sensation, full active range of motion without pain, and a normal mood and affect with a clear and linear thought process.  (*Id*.)

During a follow up with Dr. Freshwater on May 18, 2021, Ms. Pilcher reported taking Percocet and Cymbalta routinely.  (Tr. 860.)  She reported being a little more active around the house recently because "she had to," but said the additional activity increased her pain.  (*Id*.) She reported not sleeping more than a few hours at a time because of her shoulder.  (*Id*.)  She said she did not think her pain medication worked as well as it had in the past.  (*Id*.)  Dr. Freshwater explained she could be building up a tolerance to the medication, and that increasing

the dose would cause more problems. (*Id*.) On examination, Ms. Pilcher still did not swing her left arm with walking. (Tr. 861.) She exhibited tenderness over the posterior neck—in particular on the left—and in the upper trapezius, rhomboids, and around her left shoulder; Dr. Freshwater noted it did not appear worse than in the past. (*Id*.) He continued her medications but switched Flexeril to Baclofen. (*Id*.)

### ii.    Mental Health Impairments

The record does not contain mental health treatment records for the relevant period, and the psychological consultative examination is the only mental health evaluation for that period. (Tr. 711-16.) Dr. Freshwater did note that Ms. Pilcher appeared sad at her November 2020 orthopedic appointment, but she denied feeling depressed and said she was frustrated with the workers compensation process. (Tr. 466.) Mental status examination findings during a January 2021 primary care appointment reflected a normal mood and affect with a clear and linear thought process. (Tr. 803.) Ms. Pilcher reported problems sleeping at a May 2021 appointment with Dr. Freshwater, but associated it with shoulder pain rather than mental health. (Tr. 860.) At a September 2021 primary care appointment with Dr. Freshwater for an infection, Ms. Pilcher complained that her shoulder pain had increased as the weather cooled. (Tr. 873.) She also said she had not been sleeping well and reported feeling stressed due to her father's death. (*Id*.)

### 2.    Opinion Evidence

### i.    Physical Impairment Medical Opinions

__Consultative Examining Physician__

Ms. Pilcher presented for a consultative physical examination by Houston Johnson, Jr., M.D., on March 6, 2021. (Tr. 719-29.) On examination, she exhibited "significantly reduced [range of motion] at her left shoulder." (Tr. 723.) Dr. Johnson indicated that Ms. Pilcher's x-

rays did not provide an "unequivocal explanation for her problem," and that he did not observe

significant limitations with Ms. Pilcher's right wrist.  (*Id*.)  He stated in his assessment:

> Patient demonstrates significantly reduced ROM at the left shoulder. Her x-rays do
> not give an unequivocal explanation for her problem. Her limitations with lifting
> seem to initiate a lot of her complaints. She was able to lift 2lbs and 3lbs well.
> I did not appreciate significant limitations involving the right wrist.
>
> On clinical exam, [Ms. Pilcher] is a pleasant woman in no acute distress. She is able
> to undress and dress for all aspects of the exam without difficulty. She has no spinal
> tenderness and no evidence of muscular asymmetry nor atrophy and no acute joint
> findings. Strength and range of motion are within normal limits bilaterally except
> limitations involving the left shoulder. [S]he is able to sit, stand, and walk. [S]he
> was able to rise from the exam table multiple times without problems or assistance.
> Speech, hearing, vision, sensation and reflexes are grossly intact. Fine motor
> coordination and handling is normal. [S]he answered questions appropriately and
> within reason.

(Tr. 723.)

### State Agency Medical Consultants

State agency medical consultant Lynne Torello, M.D., assessed Ms. Pilcher's physical

RFC on March 22, 2021.  (Tr. 69-70.)  She opined that Ms. Pilcher could: lift, carry, push and

pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk for no more than six

hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently

climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally crawl; and

frequently reach overhead with the left upper extremity.  (Tr. 69-70.)

State agency medical consultant Gail Mutchler, M.D., assessed Ms. Pilcher's physical

RFC upon reconsideration on July 12, 2021.  (Tr. 79-81.)  Dr. Mutchler found that Ms. Pilcher

had a more limited RFC than Dr. Torello found.  (*Compare* Tr. 79-81 *with* Tr. 69-70.)  She

opined that Ms. Pilcher would have the following additional limitations: frequent pushing,

pulling, and hand controls with the left arm; frequent front/lateral reaching with the left arm;

occasional overhead reaching with the left arm; and no exposure to hazards, including unprotected heights and dangerous moving equipment.  (Tr. 79-81.)

### ii.      Mental Health Impairment Medical Opinions

**Consultative Examining Psychologist**

Ms. Pilcher attended a telehealth consultative psychological evaluation with Jessica Twehues, Psy.D., on January 26, 2021, via videoconferencing.  (Tr. 711-16.)  Ms. Pilcher reported she was seeking disability due to a history of left arm surgeries and significant pain in her arm.  (Tr. 711.)  She also reported pain when walking, anxiety, chronic kidney stones, and a history of right wrist injury.  (*Id*.)  She was married with three adult children and felt close to her husband and children.  (Tr. 711-13.)  She had obtained two associate degrees.  (Tr. 711.)

Ms. Pilcher reported that she was not participating in mental health treatment, but was taking psychotropic medication and had attended mental health counseling for a couple of months in 2018.  (Tr. 713, 715.)  She reported: her mood was down at times; she felt depressed about half the time; she had low energy and decreased motivation; she worried and was anxious all the time; she preferred to stay at home; she had panic attacks about three times per week; and she had problems sleeping.  (Tr. 713.)  She reported missing work once a month due to anxiety when she was working, but also reported a stable work history, no interpersonal problems while working, and no job terminations.  (*Id*.)  She reported some difficulty with focus and distractibility, but also said she was patient and not easily agitated.  (*Id*.)  She did not describe manic symptoms and denied delusions, hallucinations, and paranoia.  (*Id*.)  She reported spending her time during the day visiting her father, watching television, and cleaning but noted difficulty doing so because of her physical problems.  (*Id*.)  She drove occasionally and had some friends, but did not see them often due to the COVID-19 crisis.  (*Id*.)

On examination, Ms. Pilcher was pleasant and cooperative, but her posture appeared somewhat tense. (Tr. 713.) She exhibited good personal hygiene, understood the purpose of the evaluation, and appeared adequately motivated. (*Id*.) Her speech was clear, with a normal rate and tone, and fully understandable. (Tr. 714.) Her thoughts were logical, coherent, and goal directed. (*Id*.) Her intellectual abilities were within normal limits. (*Id*.) She smiled occasionally, maintained good eye contact, and her energy appeared sufficient, but her mood appeared depressed, and she was tearful when talking about her health issues. (*Id*.) She denied current suicidal or homicidal ideation. (*Id*.) Her posture was tense, but she did not appear overly anxious and related calmly and sensibly. (*Id*.) She was alert, responsive, and oriented to person, place, time, and situation. (*Id*.) She correctly recalled six digits forward and four digits backward. (*Id*.) She appeared to have adequate recent and remote recall. (*Id*.) She appeared to focus well during the conversation and her overall intellectual abilities were estimated to fall within normal limits. (*Id*.) She demonstrated insight into her mood, appeared capable of accessing community resources as needed, and her judgment appeared sufficient for her to make decisions affecting her future and to conduct her own living arrangements efficiently. (*Id*.)

Dr. Twehues opined that Ms. Pilcher met the criteria for diagnoses of unspecified depressive disorder and unspecified anxiety disorder. (Tr. 715.) She assessed Ms. Pilcher's functional abilities in the four categories of mental functioning. (Tr. 715-16.) First, with respect to understanding, remembering, and carrying out instructions, Dr. Twehues did not expect Ms. Pilcher to show limitations. (Tr. 715.) With respect to responding appropriately to supervision and coworkers, Dr. Twehues did not expect Ms. Pilcher to have significant limitations. (Tr. 716.) With respect to maintaining attention and concentration and maintaining persistence and pace to perform simple and multi-step tasks, Dr. Twehues found as follows:

10

During the interview, the claimant seemed to track conversation relevantly and did not appear easily distracted. She correctly recalled six digits forward and four digits backward. She noted some deficits with regard to concentration. Due to her experience of depressed mood, anxiety, and panic attacks, I would expect her to experience some difficulty maintaining focus for prolonged periods of time. She also appears preoccupied with concerns for her physical health which would likely lead to some problems with distractibility. She reported missing work approximately once per month due to anxiety in the past. I would expect her to experience somewhat higher than usual rates of absenteeism from work as a result of anxiety, depressed mood, and panic attacks. She does report experiencing panic attacks twice per week.

(Tr. 715.)  With respect to Ms. Pilcher's ability to respond appropriately to work pressures in a work setting, Dr. Twehues found as follows:

The claimant reported that she is easily overwhelmed with stress. She denied a history of suicidal or homicidal ideation. She reported experiencing panic attacks a few times per week. She describes mild to moderate depressive symptoms and anxiety. She appears prone to increased anxiety, depressive symptoms, and panic attacks in response to high stress. Increased stress and pressure would likely make it more difficult for her to focus and persist on work related tasks.

(Tr. 716.)

### State Agency Psychological Consultants

State agency psychological consultant Cindy Matyi, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 67-68) and mental RFC assessment (Tr. 70-72) on February 5, 2021.  In the PRT, Dr. Matyi found that Ms. Pilcher had: mild limitations in understanding, remembering, or applying information, and interacting with others; and moderate limitations in concentrating, persisting, and maintaining pace, and adapting or managing herself.  (Tr. 67.)  In the mental RFC assessment, Dr. Matyi opined that Ms. Pilcher was able to: comprehend and remember a variety of task instructions; carry out simple (1-2 step) and occasional complex/detailed (3-4 step) tasks; maintain attention; make simple decisions; adequately adhere to a schedule; maintain adequate workplace interactions; and work within a set routine where major changes are explained in advance and are gradually implemented to allow her time to

adjust to new expectations.  (Tr. 71-72.)  Dr. Matyi also opined that Ms. Pilcher's ability to

handle routine stress and pressure in the workplace would be reduced, but adequate to handle

tasks without strict time limits or production standards.  (Tr. 72.)

State agency psychological consultant Bonnie Katz, Ph.D., affirmed the findings of Dr.

Matyi upon reconsideration on June 26, 2021.  (Tr. 77-78, 81-83.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

Ms. Pilcher testified at the telephonic hearing on November 12, 2021.  (Tr. 40-49.)  She

reported that the problems preventing her from working full-time were: "[l]ifting, pulling,

reaching, and walking for long periods of time when my arm swings."  (Tr. 42-43.)  She said it

was difficult for her to drive long distances because it was hard for her to hold her bad arm up;

her "bad arm" was her left, non-dominant arm.  (Tr. 41, 45-46, 47.)  She also reported problems

with her right wrist.  (Tr. 43, 46.)

Ms. Pilcher said her doctor had given her permanent lifting restrictions, limiting her to

lifting no more than five pounds.  (Tr. 43, 45.)  She said her doctors had told her all options were

exhausted after she underwent three surgeries on her left arm and tried three years of physical

therapy, ultrasound treatments, injections, and motor manipulation.  (Tr. 45.)  As to her right

wrist, she said her doctors had not recommended treatment.  (Tr. 46.)  She reported that they told

her there was nothing else they could do for it except fuse it, which would completely limit

mobility in her wrist.  (*Id*.)  Her doctors told her they would discuss the possibility of a fusion

when her pain got to the point where she could not take it.  (*Id*.)  She said it had not gotten to that

point yet because she was not back at work putting pressure on it by pushing, pulling, and lifting

things.  (*Id*.)  Ms. Pilcher reported difficulty with reaching in all directions with both arms.  (Tr.

12

47.)  She also said she had numbness and tingling in her right hand, which made it hard for her grasp and turn things.  (Tr. 43-44.)

In addition to the problems with her arms, Ms. Pilcher testified to struggling with mental health issues, including anxiety and depression.  (Tr. 47.)  She said she was prescribed medication for both conditions and was attending counseling once a week, which helped a "little bit."  (Tr. 47-48.)  As a result of her mental health conditions, she said she had "severe panic attacks" without warning "to the point" of resulting in seizures.  (*Id*.)  She felt her mental health conditions would affect her ability to work full-time.  (*Id*.)

Ms. Pilcher also reported problems sleeping.  (Tr. 44.)  She said her medications made her sleepy and she normally slept one to four hours per night.  (Tr. 44, 48.)  She associated her inability to sleep at night with tossing and turning due to the pain in her arm.  (Tr. 49.)  She sometimes napped during the day due to her medication and getting little sleep at night.  (Tr. 44, 48.)  She napped about four days per week for one to two hours.  (Tr. 48-49.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 49-63.)  The VE classified Ms. Pilcher's past work as follows: nurse assistant, a semi-skilled, medium exertional job as generally performed and heavy as actually performed; sorter, agricultural products, an unskilled, light exertional job as generally performed and heavy as actually performed; and lab tester, a skilled, light exertional job as generally performed and heavy as actually performed.  (Tr. 50-51.)

The ALJ and Ms. Pilcher's attorney asked different hypotheticals.  (Tr. 51-63.)  In response to a hypothetical describing an individual with the light RFC ultimately assessed by the ALJ (Tr. 19-20, 51-52), the VE said the described individual would be able to perform Ms.

Pilcher's past work as a sorter as generally performed (Tr. 52).  The VE identified furniture clerk and usher as other jobs that would be available in the national economy.  (Tr. 52-53.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and

vocational factors to perform other work available in the national economy.  *Id.*

### IV.    The ALJ's Decision

In his December 21, 2021, decision, the ALJ made the following findings:[1]

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2023.  (Tr. 15.)

2.    The claimant has not engaged in substantial gainful activity since March 18, 2019, the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairments: depressive/bipolar disorder, anxiety/obsessive-compulsive disorder, and status-post left shoulder injury. (Tr. 15.) The claimant also has non-severe impairments and non-medically determinable impairments.  (Tr. 15, 17.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 17-19.)

5.    The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except: postural limitation of no climbing of ladders, ropes, or scaffolds, frequent climbing of ramps and stairs, and occasional crawling; manipulative limitations of occasional use of the left upper extremity for overhead reaching, and frequent use of the left upper extremity for other reaching, pushing, pulling, and operation of hand controls; and environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights; work is limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving

---

[1] The ALJ's findings are summarized.

assembly lines and conveyor belts, involving only work-related decisions, with few if any workplace changes.  (Tr. 19-26.)

6. The claimant is unable to perform any past relevant work.  (Tr. 26.)

7. The claimant was born in 1981 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id*.)

8. The claimant has at least a high school education.  (*Id*.)

9. Transferability of job skills is not material to the determination of disability. (*Id*.)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform: furniture rental clerk and usher.  (Tr. 26-27.)

Based on the foregoing, the ALJ found Ms. Pilcher had not been under a disability as defined in the Social Security Act from March 18, 2019, to the date of the decision.  (Tr. 27.)

## V.     Plaintiff's Argument

Plaintiff presents three assignments of error.  (ECF Doc. 8.)  First, she argues the ALJ erred in his evaluation of the opinion of consultative examining psychologist Dr. Twehues.  (*Id*. at pp. 1, 9-11.)  Second, she argues the ALJ erred in his evaluation of her subjective complaints. (*Id*. at pp. 1, 12-19.)  Third, she argues the ALJ erred at Step Four and Five by erroneously excluding an inability to use the left upper extremity from the RFC.  (*Id*. at pp. 1, pp. 19-21.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

16

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

17

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: Whether ALJ Properly Evaluated Opinion of Psychological Consultative Examiner**

In her first assignment of error, Ms. Pilcher argues the ALJ erred in evaluating the opinion of consultative examining psychologist Dr. Twehues.  (ECF Doc. 8, pp. 1, 9-11.)  The Commissioner responds that the ALJ appropriately evaluated Dr. Twehues's opinion.  (ECF Doc. 10, pp. 9-12.)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In

other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

The ALJ summarized Dr. Twehues's consultative examination report as follows:

On January 26, 2021, the claimant underwent a consultative psychological evaluation by Jessica Twehues, Psy.D. []. At the time of the evaluation, the claimant was not participating in mental health treatment. She described her mood as down some of the time, with a low energy level and reduced motivation. She further reported constant worry and crying easily. The claimant stated she felt anxious all of the time and preferred to stay at home as a result, with panic attacks approximately three times per week. She noted some difficulty with focus and distractibility []. The claimant presented as pleasant and cooperative, and rapport was easily established. She was casually dressed in good personal hygiene and appeared to understand the purpose of the evaluation. The claimant's speech was clear and understandable, with a normal rate and tone. She was adequately organized and easily followed the conversation. Her mood appeared depressed. Although she became tearful when speaking about her current health issues, she occasionally smiled and maintained good eye contact. She presented with tense posture but did not appear overly anxious and related in a calm manner. On examination, the claimant was alert and oriented. She correctly recalled six digits forward and four backward. She identified the number of weeks in a year as well as the direction the sun sets. The claimant correctly performed a multiplication calculation but did not correctly calculate change in response to one question posed. She correctly described similarities among objects and appeared to focus well. Memory appeared adequate, and insight and judgment appeared sufficient. She was assessed with Unspecified Depressive Disorder and Unspecified Anxiety Disorder [].

(Tr. 23 (internal citations omitted).) The ALJ then evaluated the persuasiveness of Dr. Twehues's opinion, explaining:

Turning to her mental health, the consultative psychologist opined that the claimant would have "some" difficulty maintaining focus for prolonged periods of time, would "likely" experience somewhat higher than usual rates of absenteeism from work as a result of her mental health symptoms, and that increased stress and pressure would "likely make it more difficult for her to focus and persist" at work []. However, it is apparent that much of this opinion was based upon the claimant's self-report of symptoms. Specifically, the opinion as to absenteeism and difficulty focusing was based upon the claimant's self-report of anxiety and panic attacks. Yet, the claimant was pleasant and cooperative, tracked the flow of conversation, and did not appear easily distracted during the interview. The only indication of anxiety noted in the report is that the claimant presented with a tense posture. However, the evaluator noted that she did not appear overly anxious and related in a calm, sensible manner []. Further, the opinion is not entirely stated in vocationally relevant terms. However, to the extent this opinion is consistent with a finding of no more than a moderate limitation in any area of mental health functioning, it is generally consistent with the record and therefore overall partially persuasive.

(Tr. 25 (internal citations omitted) (emphasis added).)

Ms. Pilcher argues that the ALJ erred by not incorporating limitations from Dr. Twehues's opinion into the RFC, specifically those relating to her ability to maintain focus and persist, her distractibility, and possible absenteeism.  (ECF Doc. 8, pp. 9-11.)  In particular, Ms. Pilcher asserts the ALJ: (1) failed to indicate whether he considered the report persuasive; (2) failed to report "the summary and conclusions that Plaintiff appeared down and was tearful"; (3) failed to evaluate the consultative examination and "consider the opined functional limitations"; and (4) failed to "offer any findings or adequately explain his findings regarding the supportability, consistency, and persuasiveness" of the opinion.  (ECF Doc. 8, pp. 10-11.)  The Court finds each of these arguments to be without merit.

First, the ALJ did not fail to state how persuasive he found Dr. Twehues's opinion.  He specifically stated: "to the extent this opinion is consistent with a finding of no more than a moderate limitation in any area of mental health functioning, it is generally consistent with the record and therefore overall partially persuasive."  (Tr. 25.)

20

Second, the ALJ did not fail to acknowledge Dr. Twehues's observation that Ms. Pilcher "appeared down and was tearful."  When the ALJ summarized Dr. Twehues's evaluation, he specifically acknowledged that Dr. Twehues had observed Ms. Pilcher's "mood appeared depressed" and she was "tearful when speaking about her current health issues."  (Tr. 23.)

Third, the ALJ did not fail to consider Dr. Twehues's examination findings and opined limitations.  On the contrary, the ALJ summarized the consultative examination findings in detail and provided an analysis of the functional limitations identified by Dr. Twehues.  (Tr. 23, 25.)

Finally, the ALJ did not fail to explain his persuasiveness finding, and the undersigned finds his explanations were reasonable and supported by the record.  First, the ALJ observed that some of the opinions were "based upon the claimant's self-report of symptoms," explaining:

> Specifically, the opinion as to absenteeism and difficulty focusing was based upon the claimant's self-report of anxiety and panic attacks. Yet, the claimant was pleasant and cooperative, tracked the flow of conversation, and did not appear easily distracted during the interview. The only indication of anxiety noted in the report is that the claimant presented with a tense posture. However, the evaluator noted that she did not appear overly anxious and related in a calm, sensible manner[.]

(Tr. 25.)  This observation was supported by the record, and it was appropriate for the ALJ to find opinions based on self-report to be less persuasive.  *See, e.g., Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016).  Second, the ALJ observed that Dr. Twehues's opinions were "not entirely stated in vocationally relevant terms."  (Tr. 25.)  Indeed, the opinions that Ms. Pilcher would have "some" problems keeping focus for prolonged periods or would "likely" experience "somewhat higher than usual rates of absenteeism" (Tr. 25, 715-16) relied on vague descriptors that provided little information regarding the extent or impact of Ms. Pilcher's functional or vocational limitations.  This observation was supported by the record, and it was appropriate for the ALJ to find vague opinions that lacked specific functional or vocational limitations to be less persuasive.  *See* 20 C.F.R. §404.1513(a)(2) (defining a medical opinion as

21

"a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in specified work activities); *see also Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018). Finally, the ALJ explained that Dr. Twehues's opinion was "generally consistent with the record" to the extent the stated limitations were interpreted to be "consistent with no more than moderate limitations in mental health functioning." (Tr. 25.)  This observation was also reasonable and supported by the record.  Dr. Twehues did not explicitly describe marked or extreme limitations, and the evidence outlined by the ALJ was consistent with mild to moderate limitations, including: generally normal mental status examination findings, including those recorded at the consultative evaluation (Tr. 17-18, 23, 713-14, 803); a lack of mental health treatment during the relevant period (Tr. 23); and opinions by the state agency psychological consultants that Ms. Pilcher had no more than mild or moderate limitations in mental health functioning.  (Tr. 25, 67-68, 70-72, 77-78, 81-83.)

Importantly, the ALJ did not ignore Ms. Pilcher's mental health conditions or fail to include RFC limitations to account for those impairments.  Despite her largely normal clinical findings and lack of treatment, the ALJ nevertheless found Ms. Pilcher's mental residual functional capacity limited her to simple, routine, and repetitive tasks in a work environment free from fast paced productions requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions, with few if any workplace changes.  (Tr. 19-20.)

For the reasons stated above, the undersigned finds the ALJ evaluated Dr. Twehues's opinion in accordance with the regulations, sufficiently articulated his reasons for finding the opinion partially persuasive, and made findings that were supported by substantial evidence. Accordingly, the undersigned finds the first assignment of error to be without merit.

22

**C.      Second Assignment of Error: Whether ALJ Erred in Evaluation of Plaintiff's Subjective Complaints**

In her second assignment of error, Ms. Pilcher argues the ALJ erred in evaluating her subjective complaints.  (ECF Doc. 8, pp. 1, 12-19.)  Specifically, she argues that the RFC "erroneously failed to include the effects of [her] pain[,] which would further impact her ability to use her upper extremities and maintain attention and concentration[.]"  (*Id.* at p. 17.)  She further argues that "the ALJ failed to articulate any supportable rationale for his finding that Plaintiff's statements . . . were not entirely consistent with the medical evidence."  (*Id.*)  The Commissioner argues in response that the ALJ's evaluation of Ms. Pilcher's subjective symptoms was supported by substantial evidence.  (ECF Doc. 10, pp. 12-15.)

 Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 21), so the discussion will be focused on the ALJ's compliance with the second step.

When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and

23

restrictions due to pain or other symptoms. *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

Here, the ALJ considered evidence regarding Ms. Pilcher's alleged pain, including her left shoulder impairment, subjective allegations regarding her pain, her treatment history, and the medical opinion evidence.  (Tr. 19-26.)  After providing a detailed analysis of the evidence and assessing the persuasiveness of the medical opinions (Tr. 20-25), he concluded that Ms. Pilcher's subjective allegations were not entirely consistent with the record (Tr. 21, 25-26).  He explained:

> While the claimant has medically determinable impairments that could reasonably cause some of the symptoms and limitations, the allegations are considerably broader and more restricted than is established by the medical evidence. This is not to say that the claimant is symptom free or does not experience difficulty performing some tasks. The evidence does establish some limitations with respect to the claimant's physical and mental abilities. However, the record does not support the severe degree of limitation alleged. In sum, the claimant's physical impairments prevent her from performing work at greater than the light exertional level, with additional limitations on climbing and crawling. Further, considering the entirety of the record, including the claimant's hearing testimony, the undersigned has limited her to occasional use of the left upper extremity for overhead reaching and frequent use of the left upper extremity for other reaching, pushing, pulling and operation of hand controls. Finally, the claimant is properly limited to avoiding all exposure to hazards such as dangerous moving machinery and unprotected heights. With respect to her mental health impairments, as discussed in more detail above, the claimant's mental health impairments result in mild limitations in understanding, remembering, or applying information and interacting with others, and no more than moderate limitations in the remaining areas of mental health functioning. These are accommodated by the assessed residual functional capacity with restrictions on work complexity, pace, and changes. Notably, although the claimant has been found to only have a mild limitation in understanding, remembering, or applying information from a mental health standpoint, the undersigned has also considered her varying levels of physical pain in providing these limitations. Accordingly, the undersigned finds that the objective evidence does not demonstrate the existence of limitations of such severity as to have precluded the claimant from performing all work on a regular and continuing basis at any time from the alleged onset date through the date of this decision. Nevertheless, the claimant's impairments as a whole have all been accommodated for within the residual functional capacity assessment set forth above (SSR 16-3p).

(Tr. 25-26 (emphasis added).)

More specifically, the ALJ acknowledged Ms. Pilcher's continued reports of pain and weakness in her left shoulder following surgery (Tr. 21-22), but also observed that Ms. Pilcher subjectively reported in October 2020 that she felt surgery was helpful and she was better than before surgery, and "[o]bjectively, her examination demonstrated improvement in range of motion and function compared to prior to her surgery." (Tr. 22, 531.)  The ALJ considered evidence that Ms. Pilcher reported in November 2020 that chiropractic therapy was helping her symptoms, "with less pain severity, improved mobility, and more ability to perform her ADLs." (Tr. 22, 495.)  He considered that Ms. Pilcher continued to report pain in December 2020, but he also considered that she reported 20% improvement in her pain and spasms in her trapezius with therapy and chiropractic treatment.  (Tr. 22, 483.)  The ALJ also acknowledged that Ms. Pilcher testified that her doctor had restricted her to lifting five pounds (Tr. 20, 43, 45), but found no evidence to support a finding that there were permanent weight-lifting restrictions in place (Tr. 22).  At her final orthopedic appointment in December 2020, Ms. Pilcher was instructed to continue with home exercises and activity as tolerated.  (Tr. 22, 486.)  She was also instructed to continue with conservative treatment of Tylenol, ice, heat, and topical analgesics.  (Tr. 486.)

A review of the ALJ's decision shows that he considered Ms. Pilcher's pain and articulated a supportable rationale for his RFC findings.  Ms. Pilcher acknowledges that the ALJ discussed her pain throughout his analysis but argues that the ALJ's findings were "contrary to the evidence in this record which established that Plaintiff had pain related to her shoulder and wrist injuries" (ECF Doc. 8, p. 16) and that the "evidence documenting [her] disabling impairments [was] ignored and/or disregarded by the ALJ" (*id.* at p. 18).  In so arguing, however, she fails to specifically identify what evidence was purportedly ignored by the ALJ.  The ALJ need not discuss every piece of evidence to render a decision supported by substantial

25

evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010)

(citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per

curiam)).  While Ms. Pilcher argues that the evidence supported additional RFC limitations

based on her pain, "[t]he substantial-evidence standard ... presupposes that there is a zone of

choice within which the decisionmakers can go either way, without interference by the courts,"

*Blakley*, 581 F.3d at 406 (internal quotations omitted), and it is not this Court's role to "try the

case *de novo*, []or resolve conflicts in evidence[.]"  *Garner*, 745 F.2d at 387.

      For the reasons explained above, the undersigned finds Ms. Pilcher has not shown that

the ALJ erred in his evaluation of her symptoms or that his analysis lacked the support of

substantial evidence.  Accordingly, the undersigned finds Plaintiff's second assignment of error

to be without merit.

**D.**    **Third Assignment of Error: Whether ALJ Erroneously Excluded Inability to Use
Left Upper Extremity From RFC**

      In her third assignment of error, Ms. Pilcher argues the ALJ erred at Step Four and Five

by failing to include an inability to use the left upper extremity in the RFC.  (ECF Doc. 8, pp. 1,

pp. 19-21.)  Specifically, she argues that the RFC lacks the support of substantial evidence

because the "evidence . . . established that [she] had difficulty using her left upper extremity."

(ECF Doc. 8, pp. 20-21.)  The Commissioner argues in response that substantial evidence

supports the ALJ's physical RFC assessment.  (ECF Doc. 10, pp. 15-16.)

      The RFC adopted by the ALJ limited Ms. Pilcher to performing a reduced range of light

exertional work, with additional limitations in her ability to reach, push, pull, and operate hand

controls with her left upper extremity.  (Tr. 19-20.)  In arguing that these limitations did not

appropriately account for her left shoulder impairment, Ms. Pilcher highlights evidence that Dr.

Nye agreed with a ten-pound lifting restriction prior to her 2019 surgery, that she underwent

surgery on her left shoulder in 2019, that she had continuing pain after her surgery, that photographs showed swelling of her left scapula and shoulder in August 2020, and that she reported pain that was not controlled by pain medication in September 2021.  (ECF Doc. 8, pp. 20-21 (citing Tr. 316, 328-31, 347, 454, 873).)  The ALJ noted that his findings were limited to a proposed disability period beginning February 11, 2020, the day after the "binding and final" denial of benefits on February 10, 2020.  (Tr. 12-13.)  Nevertheless, he considered her 2019 surgery, subsequent treatment, and reports of continued pain despite treatment.  (Tr. 21-23.)  Ms. Pilcher has not shown that the ALJ failed to consider material evidence regarding her left upper extremity impairment.

Ms. Pilcher also argues that consultative examiner Dr. Johnson "limited Plaintiff to lifting, carrying, and handling weights of 2 to 3 pounds" and observed that she had a "significantly reduced range of motion at the left shoulder."  (ECF Doc. 8, p. 21 (citing Tr. 722-23).)  The ALJ did consider Dr. Johnson's clinical findings, including the "significantly reduced range of motion of the left shoulder."  (Tr. 22-23.)  Further, a review of the consultative examination report reveals that Dr. Johnson observed that Ms. Pilcher "was able to lift, carry and handle light objects up to 2 lbs" (Tr. 722) and assessed that she "was able to lift 2lbs and 3lbs well" (Tr. 723) without offering an opinion as to her ability (or inability) to lift or carry weights heavier than three pounds.

Ultimately, Ms. Pilcher's argument that the ALJ "erroneously excluded" her "inability to use her left upper extremity" from the RFC amounts to a contention that the evidence supported greater left upper extremity limitations.  As discussed above, it is not this Court's role to "try the case de novo, []or resolve conflicts in evidence[.]"  Garner, 745 F.2d at 387.  The ALJ's finding that Ms. Pilcher was able to perform a reduced range of light work with specified limitations in

reaching and operating hand controls with her left upper extremity was supported by substantial evidence, including the opinion of state agency medical consultant Dr. Mutchler.  (Tr. 24, 79-81.)  Even if Ms. Pilcher identified substantial evidence to support greater left upper extremity limitations, this Court cannot overturn the Commissioner's decision because "substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

For the reasons set forth above, the undersigned finds the ALJ's Step Four and Five findings were supported by substantial evidence.  Accordingly, the undersigned finds Plaintiff's third assignment of error to be without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

November 16, 2023                    */s/ Amanda M. Knapp*
                                     AMANDA M. KNAPP
                                     UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 Dated: April 17, 2023(1985).